United States District Court
District of Connecticut
FILED AT HARTFORD
Nov. 18, 2003
Kevin F. Rowe, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARCIA G. COHEN, | : DN. 3:01CV1391 (AWT) |
| *Plaintiff*, | : |
| v. | : |
| ELECTRONIC DATA SYSTEMS CORPORATION, et al., | : |
| *Defendants*. | : October 27, 2003 |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

In opposing Defendants' Motion for Summary Judgment, Plaintiff shoots a quiver full of arrows at the target with the hope that the sheer number of arrows will disguise the fact that not one of them comes close to actually hitting the mark. In other words, Plaintiff attempts to avoid summary judgment by relying on a scattershot of legal axioms and inapposite case law, all-the-while tap dancing around the undisputed fact that in less than one year of employment, Plaintiff alienated EDS' customer, her supervisors and her co-workers. Her comments and behavior at the February 9, 2001 CPA meeting were just the final confirmation that Plaintiff, one of only two licensed professionals on EDS' pharmacy team, refused to recognize the negative impact her actions had on the working relationship between her and EDS, as well as EDS' relationship with its significant business partner, the State of Connecticut.

Indeed, the childish responses upon which Plaintiff relies in opposing summary judgment mirror the childish manner in which she responded to the complaints about her actions during her employment (e.g. writing **"Oops"** in her self-assessment in reference to DSS's complaints regarding

her behavior at the June 1, 2000 DUR Board Meeting). (Cohen Dep. Ex. 17). Thus, Plaintiff makes the following absurd representations that unequivocally establish that even today, Plaintiff cannot recognize the detrimental effect her supervisors reasonably believed she had, and would continue to have, on EDS' effective operations:

- Plaintiff concedes that her supervisor, Ellen Arce, instructed her to go only as an "observer" to the June 1, 2000 DUR Board Meeting at the customer's request and concedes that she did not do so. However, she childishly attempts to justify her failure to follow these instructions by stating that Arce never specifically informed her that she had to go as a "**silent** observer." (Plaintiff's Local Rule 56(a)(2) Statement at 20).

- Plaintiff concedes that Arce and Program Services Manager Nancy Honeck spoke with her on more than one occasion after the June 1, 2000 DUR Board Meeting about what she was permitted to discuss outside EDS regarding EDS business and its work for DSS. However, she asks the Court to believe that Arce and Honeck did so only to remind her of the obvious fact that she could not discuss **"proprietary"** information and she never understood that she should refrain from discussing the specifics of her work for EDS, including the details of EDS' work on behalf of its customer, DSS. (Cohen Aff. ¶21).

- Plaintiff concedes that her job description stated that she was expected to "participate[] in customer policy and rate development." She also concedes that EDS assisted DSS in the development of its policies and plans to implement DSS's legislative initiative ConnPace B **and** that she was specifically involved in that process (e.g. analyzing the Mercer Report). However, she tells the Court that neither she nor EDS had **any** involvement in the development of DSS policy - - a representation she makes based entirely on her summary of irrelevant language from a web site. (Cohen Aff. ¶3 and Attachment A).

- Plaintiff concedes that DSS employees "work closely" with the EDS Account's Pharmacy Team. She also concedes that at the time of the relevant events from April 2000 through February 2001, EDS' contract with the State of Connecticut was worth at least **25 million dollars annually**. However, she asks the Court to believe that the relationship between the relevant DSS and EDS employees (i.e. Arce, Honeck, LaFrance, Dorval, Geary and Mains) was one of only "regular communication," not one of "trust and confidence." (Cohen Aff. ¶4).

- Plaintiff concedes that she cursed and used profanity at work. However, she asks the Court to believe that these incidents were limited to the time when she was in a wheelchair recovering from foot surgery. Plaintiff even admits referring to a caller as a "stupid asshole," but asks the Court to forgive her outburst because it "may" have been said after the caller hung up. (Cohen Aff. ¶47).

2

- Plaintiff concedes that following the June 1, 2000 DUR Board Meeting incident she attended Dale Carnegie courses to improve her interpersonal skills. However, Plaintiff asks the Court to ignore the significance of this admission of her shortcomings during her employment with EDS by stating that she decided to attend the courses on her own and that EDS did not know she attended the classes until they were over. (Cohen Aff. ¶12).

- Plaintiff concedes that with the successful implementation of ConnPace B, EDS stood to gain significant new business. However, even though EDS was paid millions of dollars by DSS **to assist the State** in the implementation of ConnPace B **as the State proposed**, Plaintiff believes that the Court should find significance in the fact that EDS would gain significant business no matter how ConnPace B was implemented - - presumably even if it was not as EDS' customer wanted. (Cohen Aff. ¶34).

- Finally, and perhaps most significantly, Plaintiff concedes as part of her work for EDS that she was privy to information regarding DSS' ideas and analysis for the implementation of ConnPace B that were not available to the general public. In fact, she concedes that she was provided with a copy of the Mercer Report which she admits was "private." Plaintiff also concedes that the private Mercer Report suggested that DSS's ConnPace B proposal would not be "cost neutral." Plaintiff further avers that during the discussion regarding ConnPACE B at the February 9, 2001 CPA Meeting, she told the audience that she was speaking, "not as an employee of EDS, but as a pharmacist and member of the CPA . . . ." but also that she "works with this every day" and that she "knows what [she's] talking about." However, Plaintiff asks the Court to believe that when she chastised speaker Rick Carbray because DSS's program would "not work," she was able to carefully tailor her remarks on the spot to avoid the disclosure of any confidential information and that the audience clearly understood that her opinion was based upon her role as a private pharmacist, not as an EDS employee - - even though anyone in the audience who did not know she was an EDS employee prior to her alleged "disclaimer" clearly now knew she worked for EDS! (Cohen Aff. ¶¶35, 37, 38 and 51; Cohen Tr. 221).

These statements are representative of the vain attempt Plaintiff makes to cloud the fact that based upon their personal knowledge of Plaintiff's prior misconduct, their personal knowledge of Plaintiff's character and credibility, and on the reports they received from trusted individuals, Defendants were more than reasonable in concluding that Plaintiff's actions interfered with and potentially disrupted their operations. Waters v. Churchill, 511 U.S. 661, 676-677 (1994). In fact, as the Second Circuit concluded in Lewis v. Cowen, 165 F.3d 154, 165 (2nd Cir. 1999), Plaintiff's comments **and** behavior at the February 9, 2001 CPA Meeting were not a "'single, offhand comment

3

directed to only one other worker,'" [citations omitted], but a sustained refusal to follow the professional direction of a supervisor in a critical matter." None of the inapposite and irrelevant arguments that Plaintiff raises in her opposition detract from this necessary conclusion. Defendants, however, will briefly address each of Plaintiff's contentions in turn:

## II. PLAINTIFF HAS FAILED TO PRESENT ANY MATERIAL FACT ESTABLISHING THAT DEFENDANTS ACTED UNDER COLOR OF STATE LAW

Plaintiff claims that Arce and Honeck told her that "the client" told them to fire her and that this statement could be taken as a command by the State to terminate Plaintiff pursuant to the terms of EDS' contract with the State. (Memo in Opp at 3). It is undisputed, however, that the **only** conversations that occurred between the State and EDS following the February 9, 2001 CPA Meeting were between Arce and Dorval and Arce and Elkins. EDS' contract with the State clearly provides that the **only** State employee who can "command" EDS to remove an employee from work on the contract is the MMIS Project Manager - - Marcia Mains. (Arce Dep. Ex. 7). Yet it is also undisputed that none of the individual Defendants spoke with Mains regarding Plaintiff prior to her termination on February 28, 2001. (Arce Tr. 156; Honeck Tr. 110, 119-121; LaFrance Tr. 134, 140-141, 142, 146). Accordingly, Plaintiff's contention that there is conflicting testimony on whether the state compelled EDS to fire Plaintiff is baseless.

Moreover, Plaintiff's failure to even address the Second Circuit's clearly relevant decision in Scotto v. Almenas, 143 F.3d 105 (2nd Cir. 1998) speaks volumes for the merits of her claim that an issue of fact exists regarding whether or not EDS acted under color of state law. Plaintiff, therefore, necessarily concedes that Arce's conversations with Dorval and Elkin are not sufficient

4

to create a material issue of fact that a "meeting of the minds" occurred to specifically deprive Plaintiff of her Constitutional rights. Scotto, 143 F.3d at 114-115.

Plaintiff's further contention that the Defendants acted under color of state law because the State "is entwined in the management and control" of EDS as it relates to DSS ignores decades of unequivocal Supreme Court and Second Circuit precedent. Rendell-Baker v. Kohn, 457 U.S. 830, 841 (1982) (acts of private companies "do not become acts of the government by reason of their significant or even total engagement in performing public contracts.") See also Sherlock v. Montefiore, 84 F.3d 522, 527 (2nd Cir. 1996). Rather the Second Circuit has made clear that the "governmental oversight of a private institution does not convert the institution's decisions into those of the State, as long as the decision in question is based on the institution's independent assessment of its own policies and needs." U.S. v. Int'l Bro. of Teamsters, 941 F.2d 1292, 1297 (2nd Cir. 1991). Additionally, "[a]action taken by private entities with the mere approval or acquiescence of the state is not state action" - - even where the action taken by the private entity is based upon information provided by the state. American Mfg. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999); U.S. v. Int'l Bro. of Teamsters, 156 F.3d 354, 360 (2nd Cir. 1998). Accordingly, Plaintiff's claim that Defendants acted under color of state law merely because EDS has a contractual relationship with the State of Connecticut or because DSS employees may have approved or acquiesced in the decision to terminate Plaintiff's employment is insufficient to defeat summary judgment.

### III. PLAINTIFF ERRONEOUSLY ASSERTS THAT SUMMARY JUDGMENT MUST BE DENIED BECAUSE EDS CANNOT MEET THE STRICT SCRUTINY STANDARD

Plaintiff maintains that EDS's actions must be subjected to strict scrutiny because Plaintiff's speech did not take place in the workplace, did not address matters of internal workplace policy and

was completely divorced from the EDS employment context. (Memo in Opp. At 5). Even assuming the factual accuracy of this claim, Plaintiff misstates the law. Only recently, in Melzer v. Board of Ed. of the City of New York, 336 F.3d 185, 194 (2nd Cir. 2003), the Second Circuit specifically held that the Pickering balancing test "is **not** limited to conduct occurring at or directly relating to the workplace." (Emphasis added). In that case, the plaintiff's termination stemmed not from something done in the workplace, but from alleged First Amendment activities occurring outside the workplace and largely unconnected to it. Id. The Second Circuit emphasized that although this situation fell "outside the typical paradigm, the goal of striking an appropriate balance between employee and government interests is activated **whenever** the government seeks to regulate employees' protected speech, regardless of where it occurs or how closely it is related to work." Id. Plaintiff's theory that summary judgment must be denied because EDS cannot meet the strict scrutiny standard must be rejected as a matter of law.

### IV. PLAINTIFF CANNOT ESTABLISH THAT A GENUINE ISSUE OF FACT EXISTS AS TO WHETHER PLAINTIFF'S SPEECH HAD THE POTENTIAL TO CAUSE DISRUPTION

In a confusing, disjointed argument, Plaintiff contends that Defendants failed to meet their burden of establishing that they reasonably believed Plaintiff's speech at the CPA meeting would disrupt EDS' operations. (Memo in Opp. at 13-16; 23-29). In support of that argument, Plaintiff states that EDS misstated the applicable law relevant to the Pickering/Connick test. (Memo in Opp. at 8). Further, Plaintiff contends that summary judgment is improper because reasonable minds could differ as to whether Plaintiff's speech had the potential to cause disruption. (Memo in Opp. at 13, *citing* Johnson v. Ganim, 342 F.3d 105 (2nd Cir. 2003).

First and foremost, contrary to Plaintiff's contention, the Supreme Court clearly expressed in Waters that "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign **to a significant one when it acts as employer.**" Waters, 511 U.S. at 675 (emphasis added). In support of that cardinal principle, the Waters plurality agreed that "**substantial weight** is accorded the government employer's prediction that given speech has the potential for disruptiveness." Waters, 511 U.S. at 677-78 (emphasis added). Critically, the Court explained in Waters that:

> employers, public and private, often do rely on hearsay, on past similar conduct, on their personal knowledge of people's credibility, and on other factors that the judicial process ignores. Such reliance may sometimes be the most effective way for the employer to avoid future recurrences of improper and disruptive conduct . . . . If one employee accuses another of misconduct, **it is reasonable for a government manager to credit the allegation more if it is consistent with what the manager knows of the character of the accused.**

Id. at 676 (emphasis added). Finally, in assessing whether the government employer reasonably assessed the facts related to the employee's allegedly protected speech, the Court concluded that "**[o]nly procedures outside the range of what a reasonable manager would use may be condemned as unreasonable.**" Id. at 678. Despite Plaintiff's veiled arguments to the contrary, the government employer need only show a "likely interference" with its operations, and "not an actual disruption." Lewis, 165 F.3d at 163.

Pursuant to Waters, to determine whether the employer's belief that speech would potentially disrupt the workplace was reasonable, the Second Circuit wrote in Lewis that a court should consider whether the statement sought to be protected: (1) impairs discipline by superiors or harmony among co-workers; (2) has a detrimental impact on close working relationships, **or** (3) impedes the

7

performance of the speaker's duties or interferes with the regular operation of the enterprise. Lewis, 165 F.3d at 162.

As exhaustively detailed in Defendants' Memorandum, the Defendants more than reasonably believed that Plaintiff's open and derisive criticism of the very program that EDS's customer was paying it millions of dollars to help implement potentially interfered with the future of its contractual relationship with the State of Connecticut.[1] Despite Plaintiff's argument, Defendants are not required to prove that Plaintiff's speech <u>actually</u> caused EDS to lose its contract with the State, but only that it was reasonable for Defendants to believe that Plaintiff's behavior might logically sour that financially significant relationship - - especially in light of her previous behavior. Defendants were also reasonable in concluding that Plaintiff's speech was further evidence that she was incapable of following the direction of her supervisors, not only because they reasonably believed Plaintiff spoke with an intentional air of authority at the CPA Meeting based upon the customer's confidential information, **but also because they reasonably believed Plaintiff had once again engaged in an unprofessional and inappropriate manner**. Certainly, Defendants were entitled to rely upon what they knew of Plaintiff's past misconduct in assessing the reports of Plaintiff's

---

[1] Plaintiff's contention that Defendants unreasonably believed her speech could disrupt its relationship with the State because Plaintiff did not have a "policy role" **is belied by her very job description, the uncontested fact that she was one of only two licensed pharmacists on the EDS Account and was admittedly involved in the analysis and development of DSS's plans to implement ConnPace B.** Furthermore, Plaintiff's claim that her speech could not interfere with EDS' operations because she did not have a close working relationship "with top" EDS or DSS officials is legally meaningless. Pappas v. Guiliani, 290 F.3d 143, 148 (2nd Cir. 2002).

behavior at the CPA Meeting. Waters, 511 U.S. at 676. Defendants' conclusion that Plaintiff's speech was disruptive was more than reasonable.[2]

## V. PLAINTIFF CANNOT ESTABLISH THAT A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER DEFENDANTS' MOTIVE WAS TO RETALIATE AGAINST PLAINTIFF FOR HER SPEECH RATHER THAN FOR THE POTENTIAL DISRUPTION SHE CAUSED

Defendants do not dispute the general principle that if a genuine issue of material fact exists as to whether the motive of the employer was to retaliate against an employee for the protected speech - - rather than to prevent disruption - - summary judgment is not proper. Waters, 511 U.S. at 681-82. In Waters, the Court concluded that summary judgment was improper because there was evidence in the record that the plaintiff may have been terminated **not** because of the disruptive things she said, but because of **nondisruptive statements**. Id. at 682. While Plaintiff cites several cases in which courts concluded that summary judgment was inappropriate for this reason, **Plaintiff does not point to any evidence in the record to support the application of this line of cases to this case.** Plaintiff has not, and cannot, identify **any** fact to refute Defendants' claim that Plaintiff was fired because of the potential disruption and disharmony she caused.

To the extent Plaintiff claims that she was terminated because of her "strenuous criticisms of the ConnPace B proposals at the Meeting," Defendants again emphasize that the only conclusion

---

[2] In opposition to summary judgment, Plaintiff relies upon case law in which courts have held that summary judgment is inappropriate where reasonable minds could differ as to whether the plaintiff's speech had the potential to cause disruption. While Defendants question whether these cases are consistent with Waters, the determinative fact is that the cases upon which Plaintiff relies are clearly factually inapposite. For example, in Johnson, the Second Circuit concluded that reasonable minds could differ as to whether plaintiff's speech had the potential to cause disruption because: 1) there was **no** evidence that anyone other than upper level management saw the letter containing plaintiff's purported protected speech; 2) plaintiff was a custodian and there was no evidence that his statements could be attributed to the government; and 3) there was no evidence plaintiff even had contact with other employees or substantial interaction with the public. These critical facts alone easily distinguish Johnson from the present case. See also, e.g., Bieluch v. Sullivan, 999 F.3d 666 (2nd Cir. 1993) (summary judgment improper where **no** investigation into the allegations that plaintiff's free speech activities interfered with his job with the state).

9

that can be drawn from the evidence is that Defendants were concerned with a) the potential disruption of their contractual relationship with the State; b) the Plaintiff's ongoing failure to abide by her supervisor's instructions; c) the detrimental impact her antagonistic behavior had on her relationships with the State, her supervisors and her co-workers; d) and the fact that it was more and more evident that Plaintiff's performance was impeded by her inability to remedy her argumentative and confrontational behavior.

## VI. PLAINTIFF ADMITTEDLY CANNOT DEMONSTRATE THAT EDS CAN BE HELD VICARIOUSLY LIABLE FOR A CONSTITUTIONAL VIOLATION OF ITS EMPLOYEES

Even assuming that Plaintiff has correctly interpreted the Court's decision in Ruscoe v. Housing Authority of the City of New Britain, 259 F.Supp.2d 160 (D. Conn. 2003), with all due respect to the Court, the Supreme Court has dispositively concluded that a private corporation can be held vicariously liable for unconstitutional acts **only** where plaintiff carries her burden of establishing that the employer has an official policy that led to the alleged constitutional violation or that the alleged unlawful actor had "final policymaking authority." Mejia v. City of New York, 119 F. Supp.2d 232, 275 (E.D.N.Y. 2000). Plaintiff offers **no** evidence to satisfy either of these alternative methods of proof. Moreover, while a private corporation can be held vicariously liable if it "ratifies" an unconstitutional act, Plaintiff disingenuously argues that Deputy Account Manager LaFrance's approval of the actions of Arce and Honeck represents **EDS's** ratification of their actions. See e.g., Richardson v. Metro. Dist. Comm., 2003 U.S. Dist. LEXIS 12757, *22-*27 (D. Conn. July 23, 2003) (Municipal corporation may be liable where its **Board** ratified the alleged unlawful conduct).

## VI. PLAINTIFF CANNOT ESTABLISH THAT GENUINE ISSUES OF MATERIAL FACT EXIST TO SAVE HER CONN. GEN. STAT. §31-51Q CLAIM FROM SUMMARY JUDGMENT

As Plaintiff's 31-51q claim is controlled by the resolution of her Section 1983 claim, EDS is entitled to judgment as a matter of law. Downing v. West Haven Bd. of Ed., 162 F. Supp.2d 19, 33-35 (D. Conn. 2001). Plaintiff's conduct at the CPA Meeting interfered with the central purposes of her employment relationship - - her need to assist EDS in fulfilling its contractual obligations with its significant business partner, the State of Connecticut. From the inception of her employment, Plaintiff could not avoid doing or saying things that detracted from EDS' effective operation and interfered with her relationships with EDS' customer, her supervisors and her co-workers. Despite her supervisors' **and her own** efforts, Plaintiff refused to improve her personal shortcomings. As Defendants lawfully terminated Plaintiff because of these failures - - which included her February 9, 2001 misconduct - - Defendants are entitled to judgment as a matter of law on Plaintiff's Section §31-51q claim, as well as her Section 1983 claim.

Respectfully submitted,

By: /s/ Gary S. Starr
MARTIN T. WYMER, ESQ. (CT22965)
KENNETH B. STARK, ESQ. (CT23422)
JONATHAN S. FORMAN, ESQ. (CT22966)
Duvin, Cahn & Hutton, L.P.A.
Erieview Tower, 20th Floor
1301 E. Ninth Street
Cleveland, Ohio 44114
(216) 696-7600
(216) 696-2038 (facsimile)

- and -

GARY S. STARR, ESQ. (CT06038)
Shipman & Goodwin LLP
One American Row
Hartford, CT 06103-2819

COUNSEL FOR DEFENDANTS

## CERTIFICATION

      A copy of the foregoing was mailed first class mail, postage prepaid, on October 27, 2003, to the following persons:

William B. Barnes, Esq.  
Rosenstein & Barnes  
P.O. Box 687  
1100 Kings Hwy. East,  
Fairfield, CT 06432  
(203) 367-7922

                                                                      /s/ Gary S. Starr  
                                                       GARY S. STARR, ESQ.

356292 v.01